UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

IN RE:

RIVERSIDEWORLD, INC.                                    Chapter 7

　　　Debtor.                                 Bankruptcy No. 05-01841M

LARRY S. EIDE, trustee

　　　Plaintiff

vs.                                           Adversary No. 05-9123M

NATIONAL CITY CAPITAL CORP.;
GREAT LAKES CAPITAL INVESTMENTS, LLC;
HALLE FINE TERRION, trustee

　　　Defendants.


<u>DECISION</u>

In this proceeding, Larry S. Eide, trustee, seeks to avoid
the debtor's transfer to defendants of a deed of trust to real
property located in Hardin County, Iowa.  Trial was held December
6, 2006 in Fort Dodge.  Patrick D. Smith appeared as attorney for
Eide.  Brad C. Epperly appeared as attorney for defendants
National City Capital Corporation (National City) and Great Lakes
Capital Investments III, LLC (Great Lakes).  Terrion, as trustee,
holds the deed of trust for the benefit of National City and
Great Lakes.  This is a core proceeding under 28 U.S.C. §
157(b)(2)(H).

On April 22, 2005, three creditors of RiversideWorld, Inc.[1]
filed an involuntary petition against it under chapter 7 of the
Bankruptcy Code (11 U.S.C. § 303).  The court issued its order

---

[1] The spelling of debtor's name is not consistent in the
pleadings, briefs or exhibits.  The court will use this style.

for relief on May 13, 2005 (case doc. 15).  Eide was appointed
trustee.

Eide's complaint to avoid the transfer to defendants was
based on several theories.  Defendants moved for summary
judgment, and, on June 27, 2006, the court granted partial
summary adjudication in favor of defendants on all theories but
one.  The remaining claim is that the transfer was fraudulent
under Iowa's fraudulent transfers statute (Iowa Code, Chapter
684), which the trustee employs pursuant to his powers under 11
U.S.C. § 544(b).

<u>Findings of Fact</u>

RiversideWorld, Inc., the debtor, and its parent company,
RiversideWorld Holdings, Inc., were established in early 2001 to
purchase the assets of Riverside Book & Bible, Inc. and its
subsidiary, World Bible, Inc.  Riverside Book & Bible distributed
Christian products, and World Bible published Christian books.
Both companies were located in Iowa Falls, Iowa.  Riverside Book
& Bible was owned at the time by Jordan Industries, Inc.  Jordan
had been trying to sell the companies or their assets but it had
not found a buyer.  Jordan's president suggested a management-led
buyout to Seaman A. ("Skip") Knapp, president of Riverside Book &
Bible.

Knapp engaged the firm of McFarland Grossman from Houston to
put together a presentation to locate investors and lenders and
to consummate a purchase.  McFarland Grossman made a presentation

2

to Huron Capital Partners, LLC, (hereafter "Huron Capital"), a
private entity investment firm located in Michigan.  It expressed
interest in the investment, and it retained Internet Telebusiness
& Marketing Services, Inc. (ITMS) to perform a due diligence
investigation of the seller.  Tim Williams and Rob Murphy were
officers of ITMS.  Murphy was contacted by an acquaintance,
Michael Beauregard, a partner in Huron Capital.  Murphy called on
Richard Pigott for help with the investigation.  Pigott had had
experience in the Christian products distribution business.
Pigott had previously been an officer with Spring Arbor
Distribution Company, a Christian products distributor located in
Michigan.  Knapp had also previously worked for Spring Arbor.

Huron Capital agreed to invest in the buyout.  It used Huron
Fund, LP, an investment fund in which it was a general partner,
to purchase 87 per cent of the common stock of a newly formed
corporation, RiversideWorld Holdings, Inc. (hereafter
"HOLDINGS").  The remaining 13 per cent of the stock was
purchased by some of the management employees of seller and
perhaps by others.  Knapp was one of the employee-investors.
Pigott also invested.  It is unclear whether ITMS acquired shares
in HOLDINGS.  The Creditor Information Package and Liquidation
Plan approved by debtor states that it did (exhibit 28, p. 3,
section B).  Tim Williams, an ITMS officer, testified that it did
not own stock in HOLDINGS.  Knapp testified that it did.

HOLDINGS was formed to own all of the common stock in
RiversideWorld, Inc. which was established at the same time to be

the operating company for the book publishing and Christian products distribution businesses.

Huron Capital was the general partner in Huron Fund, LP. An entity named National City Equity Partners was a limited partner in the Huron Fund, LP. It had made a 12 million dollar investment commitment to the fund in 1999. It was a limited partner to the extent of 17 per cent of Huron Fund, LP.

National City Equity Partners was owned entirely by National City Corporation, a publicly traded company. Also, National City Corporation owned National City Bank and 100 per cent of National City Capital Corp., a defendant in this proceeding.

Great Lakes Capital Investments III, LLC is an investment vehicle that in 2001 invested in tandem with National City Equity Partners or National City Capital Corp. Jay Freund, a member of Great Lakes and a general partner of National City and of National City Equity Partners, described Great Lakes as a "compensation perk" for individuals in the "National City group." They could invest in businesses through Great Lakes.

The funding for the establishment of HOLDINGS and RiversideWorld, Inc. and the purchase of its assets came from three sources.

> Equity capital was contributed by the Huron Fund, LP (approximately $3.3 million) and management investors (approximately $500,000); Mezzanine capital was provided by National City Capital Corporation ($1,912,500) and Great Lakes Capital Investments III, LLC ($337,500), pursuant to a Senior Subordinated Note and Warrant Purchase Agreement; the balance of the purchase price was borrowed from the senior secured lenders represented by Heller Financial (approximately $12 million).

4

Stipulated Facts, Stipulated Final Pre-trial Order (hereafter

"Stipulation") (doc. 52), B-1-h.

> At the time of the asset purchase, the senior debt
> borrowed from Heller Financial was secured by
> substantially all the assets of Riverside World, Inc.
> The mezzanine capital provided pursuant to the Senior
> Subordinated Note and Warrant Purchase Agreement was
> unsecured at the time it was issued, but was subject to
> the terms and conditions of the Warrant Purchase
> Agreement.

Stipulation, B-1-i.

On February 2, 2001, RiversideWorld, Inc. executed and

delivered to National City a "Senior Subordinated Promissory

Note" for its $1,912,500 loan.  On the same date, it executed and

delivered to Great Lakes a "Senior Subordinated Promissory Note"

for its loan of $337,500.  The Senior Subordinated Note and

Warrant Purchase Agreement (hereafter "Agreement") was executed

by RiversideWorld, Inc. as "Company" and by HOLDINGS as "Parent."

Under the agreement, RiversideWorld, Inc. executed the notes, and

HOLDINGS issued warrants to National City and Great Lakes for the

purchase of shares of common stock in HOLDINGS.  The shares

subject to the warrants, if purchased, would represent 15 per

cent of the "fully-diluted Class A Common Stock" of HOLDINGS

(exhibit 1, p. 1).  At no time were the warrants used to purchase

stock.

The agreement also permitted Great Lakes and National City

to receive notice of meetings and of actions by the Board of

HOLDINGS (exhibit 1, section 8.02).  At all times relevant to the

dispute, the Agreement also gave National City and Great Lakes

the right to send one representative to meetings of the Board of

Directors of HOLDINGS (exhibit 1, section 8.02).   The

representative selected by National City and Great Lakes, the

mezzanine lenders, was Jay Freund.

> Jay Freund represented the interests of National City
> Capital Corporation and Great Lakes Investments III,
> LLC, in all matters relating to [HOLDINGS] and
> Riverside World, Inc.  At all times relevant to this
> action, Mr. Freund was an employee of National City
> Equity Partners, Inc., with the title of "Director."
> Mr. Freund's title with National City Capital
> Corporation was also "Director." [fn. 1]  Mr. Freund
> was a "Member" of Great Lakes Capital Investments III,
> LLC.
>
> [Footnote 1]  At no time relevant to this action was
> Jay Freund a member of the Board of Directors of either
> National City Equity Partners, Inc. or National City
> Capital Corporation.  In addition, it should be noted
> that at the present time, Mr. Freund's title with both
> National City Equity Partners, Inc. and National City
> Capital Corporation is "General Partner."

Stipulation, B-1-m.

> Pursuant to the Warrant Purchase Agreement, Jay Freund
> attended the following Board Meetings of [HOLDINGS] as
> the designated representative of National City Capital
> Corporation and Great Lakes Capital Investments III,
> LLC: February 2, 2002, April 26, 2002, August 19, 2002
> and October 25, 2002.

Stipulation, B-1-o.

Initially, the Boards of HOLDINGS and RiversideWorld, Inc.

each comprised three members.  Huron Capital Partners had the

right to elect two members of each board, and the management

investors had the right to elect one member of each.  Huron

Capital Partners could add a member to each board, and if it did

so, management investors could appoint an additional member to

each.

Initially, each board was composed of Brian Demkowicz and

Michael Beauregard, elected by Huron Capital Partners, and Skip

Knapp, elected by the management investors.  In the fall of 2001,

Pigott was added to the boards by Huron Capital Partners.  By no

later than April 15, 2004, Scott O'Brien was added to the boards.

> Michael Beauregard is an employee of Huron Capital
> Partners, with the title of "Partner."  Brian Demkowicz
> is an employee of Huron Capital Partners, with the
> title of "Managing Partner."

Stipulation, B-1-p.

> In February 2003, Seaman "Skip" Knapp ceased to be an
> officer of [HOLDINGS] and RiversideWorld, Inc.  [He]
> did not attend a board meeting of [HOLDINGS] or
> RiversideWorld, Inc. after January 23, 2003.

Stipulation, B-1-u, v.

Knapp offered his resignation on February 3, 2003, because

he believed that his authority and responsibility had been

significantly reduced.  He was negotiating final compensation

under his employment contract when Huron Capital Partners issued

a notice of termination for cause.  Knapp sued for compensation,

and sometime later the parties agreed on the entry of judgment in

Knapp's favor.  There is no evidence he was ever removed from his

position as director on the boards of HOLDINGS or RiversideWorld,

Inc.

In addition to the formal boards, there existed what some of

the witnesses called the "advisory board."  Others called it a

"working group."  Knapp testified that in early 2001, at the

beginning of a board meeting, Demkowicz declared that he was

setting aside the scheduled meeting, and that an expanded group

would meet as an advisory board.  It was an attempt to bring

additional expertise to the discussions.  Thereafter, board
meetings were changed to advisory board meetings by Demkowicz or
Beauregard, often at the last moment.  Members of the advisory
board included formal board members and others that had been
invited to the meeting.  According to Knapp, the advisory board
included him, Beauregard, Demkowicz, Pigott, Freund, Tim
Williams, and Rob Murphy.  Tim Williams testified that there were
no official members of the Advisory Board.  However, this was
contradicted by a memo from Pigott to "Advisory Board Members"
dated April 23, 2002 (exhibit 36).  It memorialized the "Manager-
Owners' designation of Skip Knapp as Advisory Board member for
2002."  Advisory Board members had access to corporate financial
information.  There is no evidence they participated in formal
voting with official board members on corporate resolutions or
other official matters.

Under the Agreement, HOLDINGS and RiversideWorld, Inc. were
obligated to provide National City and Great Lakes with audited
annual financial statements, unaudited monthly financial
statements, detailed management reports, and financial projection
reports (exhibit 1, section 8.01(a), (b), and (e)).

The Agreement restricted RiversideWorld, Inc. from disposing
of all or any substantial part of its business or assets until
payment of all principal and interest on the notes (exhibit 1,
sections 9.06(a) and 9.09).  The promissory notes were subject to
a "Subordination and Intercreditor Agreement" among National
City, Great Lakes, Heller Financial, Inc., as agent for the

senior lenders, RiversideWorld, Inc., and HOLDINGS (exhibit 1(c)).  The claims of National City and Great Lakes were subordinated to the claims of senior lenders, and RiversideWorld, Inc. agreed that it would not make, and Great Lakes and National City agreed they would not accept, certain distributions or transfers, including security interests, until senior debt had been paid in full (exhibit 1 (c), section 2.3).  GE Capital appears to have been the major senior lender.

By the latter part of 2001, management at RiversideWorld, Inc. recognized a shift in the Christian products marketplace. It observed a marginalization of the industry's independent retailers which were the "lifeblood" of its business (exhibit 27, section IIA).  It saw 2001 as a major financial disappointment (id., section IIB).  It blamed its performance in earnings on a weak economy, dwindling prospects for the independent Christian retailers it served, administrative turmoil, and the "cultural impact of 9/11" (id.).

In 2002, earnings were markedly down from 2001.  Sales suffered throughout the year, and the company "ended the year breaking the most important covenants with the Secured Lenders" (id.).  In late 2002, RiversideWorld, Inc. noted that its payables became "significantly stretched" (id.).  Approximately 26 per cent of its payable balances were beyond vendor terms (id.).  The year 2003 proved even more difficult operationally (id.).

On November 6, 2002, RiversideWorld, Inc. entered into a

waiver and amendment agreement regarding default on certain financial covenants with senior lenders (exhibit 61). The defaults concerned failure to comply with requirements as to the ratio of indebtedness to EBITDA (earnings before interest, depreciation and amortization) (id.). It was at least the second such default during that year (exhibit 60).

On December 1, 2002, Pigott sent a memo to the "Advisory Board of Directors" (exhibit 7). The memo discussed the risks to investment in the company. It pointed out the default on covenants with Heller's principal, GE Capital, and the likelihood of "unprecedented slowness in first quarter collections of accounts." Pigott discussed what he called the "dreadful" sales level in the products distribution business. He pointed out that "[o]ur payables situation as of 11-30-02 is sufficiently stretched to cause alarm" (id., para. 10). Pigott wrote that he was "gravely concerned" and worried that creditors might throw the company into bankruptcy. If matters continued, it could lead to a forced liquidation in 2003. Pigott recounted that he had talked to Michael Beauregard, and was told that from the perspective of Huron Capital Partners, a forced liquidation during 2003 was "wholly unacceptable" (id., p. 1 ¶ 2).

Pigott said that the company had to create a "liquidity event" to buy time and options. He brought up the options of selling the World Bible division or Riverside Distributions division. He opined that if World Bible could be sold for book value or the distribution division could be sold for $4 million

over book value, it might be sufficient to safeguard invested
capital.

In a later memo to Advisory Board Members regarding the
January 27, 2003 Board Meeting, Pigott indicated that there had
been or would be a presentation on the "increase in serious
payables delinquency" (exhibit 42, para. 6).

On January 15, 2003, Foundation Publications, Inc. filed a
civil action for breach of contract against RiversideWorld, Inc.
In July 2003, during the litigation, Foundation took Pigott's
deposition.  The parties agreed on the record at the deposition
that Pigott's responses concerning the possible full or partial
liquidation of RiversideWorld, Inc. would remain confidential.

RiversideWorld, Inc. found a buyer for the World Bible
division.  During July 2003, National City, Great Lakes, and
RiversideWorld, Inc. began negotiations which led to the
execution of Amendment No. 3 to the "Senior Subordinated Note and
Warrant Purchase Agreement" (exhibit 12).  The creditors
consented to the sale of the World Bible division, and agreed to
defer quarterly interest payments from July 1, 2003 (id.).
RiversideWorld, Inc. and HOLDINGS agreed to grant National City
and Great Lakes security interests in all of their assets (id. at
pp. 2 and 4).  There was sufficient consideration to support the
granting of the security interest (Stipulation, B-1-e).  The
security interests included the Second Deed of Trust in the
Hardin County property (exhibit 12A).  The Deed was executed
October 6, 2003 by Beauregard, and it was recorded on October 16,

2003 (id.).  The trustee was Halle Fine Terrion.  In March 2004,
a partial release from the deed was executed and recorded to
correct a legal description and to release a portion of the
property.

Foundation obtained judgment against RiversideWorld, Inc.
for $114,556.67 on May 21, 2004.  At the time of the involuntary
petition, Foundation was an actual unsecured creditor of the
debtor (Stipulation, B-1-f).

RiversideWorld, Inc. continued to negotiate with Heller/GE.
Closing of the World Bible sale was planned for mid-September
2003.  Beauregard sent an e-mail to Thomas Hjorth of GE on
September 10, 2003 asking for limited lien release and waiver
(exhibit 64).  Beauregard told Hjorth that he saw "no reason to
'covenant' an APA [asset purchase agreement] or LOI [letter of
intent] for the sale of the Riverside business by Dec 31....  I
cannot allow a 'forced sale' covenant to be in the document with
a deadline for progress (LOI, etc.) to be any sooner than March
31, 2004" (id.).

On September 18, 2003, RiversideWorld, Inc. and Heller (for
the senior secured lenders) executed an Eighth Amendment to Loan
and Security Agreement (exhibit 53).  The agreement amended
section 4.27 of the parties' loan agreement to require the sale
of the distribution business.  RiversideWorld, Inc. was required
to deliver to Heller by March 31, 2004 a letter of intent for the
sale of substantially all assets of debtor's business.  The
amendment required payment in full to the senior lenders by May

31, 2004.  I find that by no later than September 10, 2003, RiversideWorld, Inc. had determined to liquidate its assets.

At the time RiversideWorld, Inc. granted the Deed of Trust to Great Lakes and National City, its total liabilities exceeded its total assets at book value (exhibit 46).  As of September 2003, the balance sheet showed $21,980,317 in assets at book value after depreciation.  Without depreciation, book value of all assets was $22,113,678.  Total liabilities were $25,866,281 (id.).  However, Eide introduced no evidence as to the fair value of the assets at the time.

At the time RiversideWorld, Inc. granted the Deed of Trust to the defendants, its monthly earnings before interest, taxes, depreciation, and amortization had been a negative amount for three to four months.  From May through the end of September, RiversideWorld, Inc. had total earnings (EBITDA) for the period of NEGATIVE $1,262,534.  Rodney Brockett, RiversideWorld, Inc.'s assistant controller from 2001-2004, testified that RiversideWorld, Inc. was having difficulty paying its debts as they became due both before and after the sale of the World Bible division.  He said that after the sale, the company was still in trouble and was paying the creditors who were the "squeaky wheels."  I find and conclude that at the time RiversideWorld, Inc. granted the Deed of Trust to defendants, it was presumed to be insolvent in that it was generally not paying its debts as they became due.  The presumption of insolvency has not been rebutted by the defendants.

I find that at the time the transfer of the Deed of Trust was made to Great Lakes and National City, they, through Freund had reasonable cause to believe that RiversideWorld, Inc. was insolvent.  The evidence proves that Freund was informed throughout the lending relationship of the financial condition of RiversideWorld, Inc.

By January 2004, RiversideWorld, Inc. had signed a contract with NACM Great Lakes (National Association of Credit Management) for services on behalf of unsecured creditors in an out-of-court liquidation (exhibit 29).  On January 19, 2004, at a board meeting, Pigott outlined the company's proposed liquidation plan, which the board then ratified.  The board also approved the retention of outside liquidation legal counsel (exhibit 45).

On or about January 12, 2004, Pigott had notified unsecured creditors that RiversideWorld, Inc. was going out of business (exhibit 31).  Included with his letter was an information package and liquidation plan with claim form (exhibit 27).  This action was ratified by the board on January 19, 2004.

Throughout the liquidation process, RiversideWorld, Inc. made an effort to pay in full the debt to the senior secured lender.  By June 15, 2004, it had done so (exhibit 47).  The payoff placed National City and Great Lakes in first position as to the remaining assets including real estate.  Throughout the remaining liquidation process, RiversideWorld, Inc. management made every effort to pay National City and Great Lakes.

On or about September 20, 2004, the Nyemaster Goode Law Firm was retained by National City Capital Corporation

and Great Lakes Capital Investments III, LLC to
institute an action in State Court to foreclose the
Security Interest.

Stipulation, B-1-r.

The Nyemaster Good Law Firm represented Riversideworld,
Inc. prior to the Involuntary Bankruptcy Petition being
filed.

Stipulation, B-1-s.

On September 20, 2004, Great Lakes and National City filed
their foreclosure petition against RiversideWorld, Inc. in the
Iowa District Court for Hardin County.  They claimed to be owed
$2,077,917.67 in the aggregate and that the only remaining asset
was the encumbered real property.  After the filing of the
involuntary petition, National City and Great Lakes obtained
relief from the automatic stay to continue their foreclosure
action.  On December 2, 2005, the state court issued its judgment
and decree granting judgment for $2,148,264.68 and foreclosing
the Deed of Trust.


Conclusions of Law

Trustee Eide may avoid any transfer of an interest of
RiversideWorld, Inc. in property that is voidable under
applicable law by a creditor holding an unsecured claim that is
allowable under section 502 of the Bankruptcy Code (Title 11,
United States Code).

Applicable law includes the statutes of Iowa.  Section
684.5(2) states:

A transfer made by a debtor is fraudulent as to a
creditor whose claim arose before the transfer was made

> if the transfer was made to an insider for an
> antecedent debt, the debtor was insolvent at that time,
> and the insider had reasonable cause to believe that
> the debtor was insolvent.

Eide may avoid the transfer to the extent necessary to satisfy

the actual creditor's claim.  Iowa Code § 684.7(1)(a).

A debtor, under Iowa's fraudulent transfer statute is

presumed to be insolvent if it is "generally not paying [its]

debts as they become due."  Iowa Code § 684.2(2).

Based on my findings, I conclude:

> Eide, as trustee, may employ 11 U.S.C. § 544(b) to
> avoid a transfer if it is voidable under Iowa Code
> § 684.5(2);

> Foundation Publications, Inc., at the time of the
> transfer, held an unsecured claim that is
> allowable under 11 U.S.C. § 502.

> If otherwise avoidable, Eide may avoid the
> transfer to the extent necessary to satisfy a
> claim in the approximate amount of $114,556.67,
> the amount of the claim of Foundation
> Publications, Inc.

> The transfer of the security interests, including
> the Deed of Trust, to Great Lakes and National
> City were on account of antecedent debts.

> RiversideWorld, Inc. was insolvent, within the
> meaning of Iowa Code § 684.2(2), at the time of
> the transfer of the security interests.

> Great Lakes and National City had reasonable cause to
> believe that the debtor was insolvent at the time of
> the transfer of the security interests.

The remaining issue is whether either National City or Great

Lakes is an insider of the debtor.  The Iowa fraudulent transfer

statute defines "insider" to include various entities depending

on the nature of the debtor.  Iowa Code § 684.1(7).

If the debtor is a corporation, insiders include all of the

16

following:

       (1) a director of the debtor
       (2) an officer of the debtor
       (3) a person in control of the debtor
       (4) a partnership in which debtor is a general partner
       (5) a general partner in a partnership described in
           subparagraph (4).

Iowa Code § 684.1(7)(b)(1)-(5).

An "affiliate" includes, with certain exceptions not relevant in this case, "a person who directly or indirectly owns, controls, or holds with power to vote, twenty percent or more of the outstanding voting securities of the debtor...."  Iowa Code § 684.1(1)(a).  An "affiliate" also includes "a corporation twenty percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor or a person who directly or indirectly owns, controls, or holds with power to vote, twenty percent or more of the outstanding voting securities of the debtor...."  Iowa Code § 684.1(1)(b).

Insider also includes "[a]n affiliate, or an insider of an affiliate as if the affiliate were the debtor."  Iowa Code § 684.1(7)(d).

Insiders specifically defined by the statute are often called "statutory insiders."  However, the term "insider" is not limited to those specifically described.  The definitions of "insider" in the Iowa statute are similar, if not identical, to the definitions of "insider" in the Bankruptcy Code.  <u>See</u> 11 U.S.C. § 101(31)(B).  Cases interpreting the latter are therefore instructive.

17

An insider is said to be an entity with a sufficiently close relationship to the debtor that its conduct is made subject to closer scrutiny than those dealing at arm's length with debtor. In re Controlled Power Corp. of Ohio, 351 B.R. 470, 475 (Bankr. N.D. Ohio 2006).  A creditor not dealing at arm's length with debtor, and whose special relationship with debtor enables it to compel payment of its claim, has sufficient control over debtor to be deemed an insider (id. at 475, citing K & R Mining, Inc. v. Keffler Construction Co. (In re K & R Mining, Inc.), 103 B.R. 136 (Bankr. N.D. Ohio 1988)).

Huron Capital Partners and Huron Fund, LP are statutory insiders of HOLDINGS and RiversideWorld, Inc.  Beauregard and Demkowicz are statutory insiders of HOLDINGS and RiversideWorld, Inc.

Freund is a statutory insider of Great Lakes, National City, and National City Equity Partners.  National City Equity Partners is not a statutory insider of Huron Fund, LP.  If Huron Fund, LP were the debtor, a general partner in Huron Fund, LP would be a statutory insider, but a limited partner would not.  Iowa Code § 684.1(7)(c).  If National City Equity Partners is not a statutory insider of Huron Fund, LP, then it is not a statutory insider of HOLDINGS or RiversideWorld, Inc.

I conclude that Jay Freund is not an insider of debtor.  He did attend meetings of the boards of HOLDINGS and RiversideWorld, Inc., but he was directed by Great Lakes and National City to do so.  Great Lakes and National City had contracted for the right

to be present in their loan agreements with HOLDINGS and

RiversideWorld, Inc.  There is no evidence that the loan

agreement was anything other than an arm's length transaction.

Also, there is no evidence that at board meetings Freund directed

official board members or officers or that he voted on any

matters.  Also, I conclude that Freund was not an insider of

RiversideWorld, Inc. by virtue of being part of the advisory

board.  There is no evidence that any advice, counsel or opinions

of the advisory board were binding on the official boards.

The limited partnership of National City Equity Partners in

Huron Fund, LP, an insider of HOLDINGS and RiversideWorld, Inc.,

and the close relationship of National City Equity Partners to

National City, the secured creditor, certainly subject the

transfer of the security interest to close scrutiny.  National

City Equity Partners is owned entirely by National City Corp.

which also owned 100 per cent of National City.  Thus, National

City Equity Partners, a limited partner in Huron Fund, LP, was a

"sister entity" to National City.

The question is whether the National City Equity Partners'

17 per cent limited partnership in Huron Fund, LP enabled it to

compel RiversideWorld, Inc. to grant security interests to

National City.  I do not find it did, although it perhaps gave

Huron Capital Partners and thus RiversideWorld, Inc. a reason to

voluntarily prefer National City over other unsecured creditors.

I find that the reason National City was able to compel

transfer of the security interests was its contractual right to

prevent the sale of World Bible by RiversideWorld, Inc.
Management of RiversideWorld, Inc. believed that if there was any
hope in preserving any equity in the debtor, it would have to
create a strategic event to produce liquidity.  Sale of World
Bible was to be that hoped-for event.  It is reasonable to infer
that the sale was more important to RiversideWorld, Inc. than
prevention of further encumbrances on its assets.

There is no evidence that National City's contractual right
to prevent such sales was not obtained at arm's length at the
outset of the loans.  I find also there is no evidence that
National City Equity Partners, by virtue of its limited
partnership interest in Huron Fund, LP, controlled
RiversideWorld, Inc.  I find and conclude that National City was
not an insider of RiversideWorld, Inc.

I find and conclude also that Great Lakes was not an insider
of RiversideWorld, Inc.  The only connection between National
City Equity Partners and Great Lakes was Freund's membership in
Great Lakes and his general partner status in National City
Equity Partners.  I find and conclude that Great Lakes' right to
prevent the sale of World Bible was its leverage for obtaining
the security interests.

Plaintiff's claim under 11 U.S.C. § 544(b) and Iowa Code §
684.5(2) will be dismissed.  Also, I incorporate the findings and
conclusions from my ruling on defendants' motion for summary
judgment and will now enter judgment dismissing the trustee's
other claims against defendants.

IT IS ORDERED that the claims of Larry S. Eide against
National City Capital Corp., Great Lakes Capital Investments III,
LLC, and Halle Fine Terrion are dismissed with prejudice.
Judgment shall enter accordingly.

DATED AND ENTERED   APRIL 3, 2007

William L. Edmonds, Chief Bankruptcy Judge